June 17, 1886

CLINE *v.* CLINE

Wally Cline

Respt

-vs-

⎫
⎬ No 1
⎭

Jacob Cline

Appellant

Jacob Cline

Appellant

-vs-

⎫
⎬ No. 2
⎭

Wally Cline

Respt

(16 P 282, November 9, 1887.)

*O. P. Mason* and *R. & E. B. Williams,* for appellant.
*F. B. Jolly* and *Gearin & Gilbert,* for appellee.

THAYER, J. It is an old, familiar case; this makes the third time it has been here in some form, and it always comes from a decree in favor of Walley Cline, granting her a divorce from Jacob Cline, and one-third of his property. The record invariably shows that large sums, by way of allowances, have been granted said Walley to enable her to prosecute and defend the litigation. The first decree was granted by the circuit court upon grounds which the court deemed insufficient, if true, and the evidence of their truth was strongly controverted. The case was remanded to the circuit court, with directions to dismiss the complaint. Both parties then commenced suit against each other. Jacob claimed that Walley had willfully deserted him for the period of three years, and she claimed that he had committed adultery. Both cases were heard in this court. Walley's decree was reversed, and the complaint in the two cases dismissed.

Then the present suit was commenced by Jacob for willful desertion, having, in the mean time, renewed his request to her to live with him. And Walley set up, by way of counter-claim, adultery upon his part. The desertion is claimed to have occurred January, 1881. The marriage of the parties took place in 1878. Walley was then a widow about 32 years of age, and had one

child. Jacob was old enough at that time to be a patriarch; was almost 66 years old, had been married a great number of times, and had had several divorce cases. His experience, however, seems not to have added a particle of wisdom to his understanding. He was ready to rush in and become an actor again in the same old farce. He was possessed of some property,— it amounted to $25,000 or $30,000, perhaps,— and that, I apprehend, was the attraction and influence which induced a comparatively young woman to marry him. Such marriages, as a matter of course, were no more in effect than an agreement to cohabit, and their endurance depended entirely upon the disposition of the parties; there was no pride, honor, or self-respect, much less affection, to uphold them, and a divorce suit was pretty certain to follow. It appears in this case that the parties only pretended to live together under the same roof for about three years, and that period in their lives, I imagine, was marked by scenes of almost constant contention. It was, no doubt, an irrepressible conflict between opposing forces, and endured as long as they attempted to stay together. It is claimed by the appellant, and I think the proof in the case shows, that the immediate cause of the separation was Jacob's refusal to make over to Walley a part of his property. She wanted the house and land where they lived put in her name, and, of course, he objected to it. She then left, and they have not lived together since. That was more than six years ago. He is anxious to get a divorce from her in order, probably, to get rid of her. And she wants to get a divorce from him, no doubt, in order to get a third of his property, under the pernicious act of 1865. Jacob wants to be relieved from the constant plundering he has been subjected to during the last four

or five years; and she wants to realize the objects and purposes for which she married him. I do not think either has a motive higher than I have indicated. He testifies that she told him, upon an occasion when he proposed that she come back, and go with him to California, that there were two men who were going to find her evidence that he had done enough to entitle her to a divorce if she would give them half of what she got. Whether this is true or not, I am unable to determine; but the evidence in the case certainly tends strongly to prove that she adopted that kind of course.

The main testimony, upon which the decree herein was granted, comes from the mouths of two persons who contracted with her to watch the old man, and who swear that they caught him *in flagrante delicto;* and a shameless female came upon the witness stand, and tacitly admitted that she had had sexual intercourse with him. Such kind of evidence disgraces judicial proceedings. A person who would engage himself for hire to spy out affairs of that kind, and make proof of them, is entitled to no credit whatever; and a woman so devoid of modesty and delicacy as to confess to her having had such connection, in order to enable a party to obtain a divorce, is too abandoned to be believed under oath. This evidence was refuted by the direct testimony of the appellant, and by cogent facts and circumstances, and, in my opinion, was not sufficient, either under the decalogue or modern legislation, to justify the granting of a divorce. If the law enacted by the legislature, which provides for granting divorces, were administered in accordance with its reason and spirit, there would be less cause to deplore its liberality. The law is too often misused. It is employed to carry out mercenary schemes, frequently designed before the marriage re-

lation was entered into. Courts should never give countenance to any such contrivance, and when such purpose is indicated, in the slightest degree, in a divorce proceeding, the affair should be examined with the closest scrutiny. This court was satisfied when the case before the present one was heard, that Walley Cline's excuse for leaving Jacob was not a sufficient justification for the act, and her course since has strengthened the conviction that her doing so was in furtherance of a design on her part to realize a profit out of her marriage with him, through means of law which provides for its dissolution. He requested her to return in April, 1883, and again in 1886, and she declined at both times. It is claimed by her counsel that these requests were not made in good faith; that Jacob did not want her to come back, but made the requests as a matter of form. There is testimony tending to show that such was the fact, but that evidently was not what influenced her to refuse. She ought to have returned, even though she entertained a suspicion that Jacob was insincere. Her return would have been the best way to test his sincerity, and would have shown that she was willing to perform the marital relations upon her part.

But the evidence discloses that at the time of the latter request, in 1886, she had the detectives, the two witnesses before referred to, watching the old fellow, to make evidence against him upon which she could maintain a suit for divorce. It was not an attempt to secure proof of acts Jacob had done while he and Walley lived together, and which occasioned her separation. It was to track him about, and find out what he might be doing five years after that time, not for the purpose of ascertaining whether she could or not confidently go back and live with him, as his wife,

but to procure evidence that would enable her to obtain a share of his property. It is too apparent that the real object of these suits upon her part had been for profit, and not to obtain redress for a violation of the marriage contract upon his part. It requires a good deal of credulity to believe that a man past 74 years, and in poor health, would be engaged in the amorous affairs Jacob was charged with. It was highly improbable on the face of it, and the testimony produced to establish it, in order to have any weight, should have come through witnesses who were entitled to full credit. The evidence of an informer, who was to share in the property through its means, or of a person hired to ascertain the facts and swear to them, would be insufficient, unless corroborated by other proof, of an unexceptionable character. It is claimed, also, upon the part of the respondent's counsel, that Walley's leaving Jacob was not a willful desertion, within the meaning of the law; that if she had cause to leave, or honestly believed that she had good grounds for leaving, it would not be such desertion. This court decided in the first case that she had no grounds for a divorce, and that, in effect, determined that she had no good cause for leaving; and her remaining away, after the request that she return, would indicate that the desertion was willful; or if it appeared, as the evidence tended strongly to prove in the first case, and is corroborated by the evidence in the two others, that she left with a purpose and design of obtaining a divorce, in order to obtain a share of Jacob's property, it would be willful. Her right to the undivided one-third part of the real estate owned by him was only incidental to her obtaining a divorce, and her making that the principal object of her proceeding evidenced bad faith. A woman has no right to leave

her husband, unless she is unable to remain with him with safety to her person, or consistently with a due sense of her self-respect. She had no right to go away in order to promote her pecuniary interests, or because she entertains a dislike towards him, and if she were to do so the law would adjudge it a willful desertion. The evidence in this case clearly establishes a desertion, and I think the circumstances tend very strongly to show that it was willful. Its continuance has extended far beyond the period which authorizes a dissolution of the marriage contract upon that ground, which, under the former law, was three years. It has since been shortened to one year. In my opinion the appellant is entitled to a dissolution of the marriage contract between him and the respondent, and that the latter should take nothing by her answer and counter-claim filed to the complaint in the suit. I am somewhat persuaded in favor of this view as it is the only way in which an end can be put to the litigation between these parties, unless one of them should die. So long as the matter remains open, and they both continue to live, it will be revived in some form, and require the attention of the courts to adjust. Granting Jacob a divorce will close the affair completely, "a consummation most devoutly to be wished."

A decree will be entered reversing the decree appealed from, and in accordance with the principles of the foregoing opinion, upon the appellant's paying the costs and disbursements of the appeal.

A petition for a rehearing was duly filed, and, by the court, denied on the tenth of January, 1888.